Nos. 2015-1532, 1535

# United States Court of Appeals for the Federal Circuit

ULTIMATEPOINTER, L.L.C.,

*Plaintiff-Cross-Appellant,*

v.

NINTENDO CO., LTD.,
NINTENDO OF AMERICA INC.,

*Defendants-Appellants.*

Appeal from the United States District Court
For the Western District of Washington
Case No. 2:14-CV-00865-RSL
District Judge Robert S. Lasnik

## OPENING BRIEF OF DEFENDANTS-APPELLANTS

JERRY A. RIEDINGER
TYLER C. PETERSON
PERKINS COIE LLP
1201 Third Ave., Ste. 4900
Seattle, WA 98101
(206) 359-8000

MARK C. NELSON
*PRINCIPAL COUNSEL*
STEVEN M. GEISZLER
RICHARD D. SALGADO
DENTONS US LLP
2000 McKinney Ave., Ste. 1900
Dallas, Texas 75201
(214) 259-0935

*Attorneys for Defendants-Appellants-Cross Appellees Nintendo Co., Ltd. and Nintendo of America Inc.*

## CERTIFICATE OF INTEREST FOR DEFENDANTS-APPELLANTS

1. The full names of every party represented by me are Nintendo Co., Ltd. and Nintendo of America Inc.

2. There are no other real parties in interest represented by me.

3. Nintendo of America Inc. is owned by its parent corporation Nintendo Co., Ltd. Nintendo Co., Ltd., whose stock is publicly traded in Japan, owns 100% of Nintendo of America Inc. There are no parent corporations or any publicly held companies that own 10 percent or more of the stock of Nintendo Co., Ltd.

4. The names of all law firms and attorneys that appeared for the Nintendo Defendants in the district court or are expected to appear in this court are:

Mark C. Nelson
Steven M. Geiszler
Richard D. Salgado
Mark J. Ziegelbein
Meagan E. Dyer
DENTONS US LLP
2000 McKinney Ave., Suite 1900
Dallas, Texas 75201-1858

Jennifer D. Bennett
Arthur Beeman*
DENTONS US LLP
1530 Page Mill Rd., Suite 200
Palo Alto, California 94304-1125

Jerry A. Riedinger
Tyler C. Peterson
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099

Trey Yarbrough
Debby Gunter*
YARBROUGH WILCOX PLLC
100 E. Ferguson St., Suite 1015
Tyler, Texas 75702

* No longer with firm.

June 22, 2015
Date

/s/ Mark C. Nelson
Mark C. Nelson

# TABLE OF CONTENTS

Page

**TABLE OF ABBREVIATIONS AND GLOSSARY** ............................................. VII

**STATEMENT OF RELATED CASES**............................................................ 1

**INTRODUCTION**.......................................................................................... 2

**JURISDICTIONAL STATEMENT** ................................................................ 4

**STATEMENT OF THE ISSUES** .................................................................... 6

**STATEMENT OF THE CASE AND FACTS**.................................................. 6

A. UltimatePointer's Inclusion of Retailer Defendants .................................. 8

B. UltimatePointer Accused Non-Nintendo Products To Avoid Severance and Transfer. ....................................................................... 9

C. The District Court Initially Denied Defendants' Motions to Sever. But This Court Granted A Writ Of Mandamus. The District Court Then Severed, Stayed, and Transferred. ......................................... 10

D. UltimatePointer's Infringement Contentions ............................................ 11

E. Defendants' Summary Judgment Motions................................................ 15

**SUMMARY OF ARGUMENT** ..................................................................... 18

**STANDARD OF REVIEW**............................................................................ 20

**ARGUMENT**................................................................................................ 22

I. THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO AWARD FEES BASED ON ULTIMATEPOINTER'S IMPROPER ATTEMPTS TO MANIPULATE VENUE. ................................ 24

A. The District Court's Decision Was Inconsistent With The Eastern District Of Texas's Findings. ...................................................................... 25

**TABLE OF CONTENTS**
**(continued)**

**Page**

B. The District Court's Decision Was Inconsistent With Its Own Findings Regarding The Improper Inclusion Of More Than 1,700 Accused Products Without Any Investigation. ....26

C. The District Court Failed To Recognize The Full Scope Of UltimatePointer's Conduct. ....27

D. UltimatePointer's Conduct Significantly Increased Nintendo's Litigation Costs. ....30

II. THE DISTRICT COURT ABUSED ITS DISCRETION BY UNDERVALUING THE IMPACT OF ULTIMATEPOINTER'S FAILURE TO INVESTIGATE. ....31

A. The District Court Correctly Found That UltimatePointer Failed To Conduct An Adequate Pre-Litigation Analysis Of Most Of The Accused Products And Failed To Articulate Infringement Contentions Regarding Those Products. ....31

B. The District Court Abused Its Discretion By Limiting The "Exceptional Case" Finding To The 1,700 Accused Products That UltimatePointer Failed To Acquire Or Analyze. ....34

C. The District Court Awarded Too Little For The 1,700 Accused Products That UltimatePointer Neither Acquired Nor Analyzed. ....37

III. THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO AWARD FEES BASED ON ULTIMATEPOINTER'S PERSISTENT PURSUIT OF CLAIMS FORECLOSED BY CLAIM CONSTRUCTION. ....41

A. The District Court Based Its Decision On Erroneous Understandings Of UltimatePointer's Obligation Not To Pursue A Meritless Claim. ....43

B. The District Court Improperly Shifted The Duty To Dismiss Meritless Claims From The Plaintiff To The Defendant And Based Its Decision On Erroneous Understandings Of The Pre-Transfer Proceedings In The Eastern District Of Texas. ....45

# TABLE OF CONTENTS
(continued)

**Page**

1. Nintendo Did Seek—And Obtain—Summary Judgment Within The Rules Of The Eastern District Of Texas. ....46

2. Nintendo's Other Challenges To UltimatePointer's Case Did Not "Delay" The Case, But Were Instead Necessitated By UltimatePointer's Improper Conduct. ....48

C. UltimatePointer Improperly Maintained This Litigation Long After Judge Davis's Claim Construction Foreclosed The Outcome. ....50

1. UltimatePointer Has Known For Years That The Wii Remote Is Not A "Direct Pointing Device." ....50

2. UltimatePointer Could Not Reasonably Contend That The Wii Has An "Image Sensor," As Construed By Judge Davis. ....52

IV. THE DISTRICT COURT DID NOT ADDRESS NINTENDO'S REQUEST THAT ULTIMATEPOINTER AND ITS COUNSEL BE JOINTLY AND SEVERALLY LIABLE FOR FEES AWARDED. ....54

**CONCLUSION** ....55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Automated Bus. Co. v. NEC Am., Inc.*,
202 F.3d 1353 (Fed. Cir. 2000) .......... 24, 43

*Central Soya Co. v. Geo. A. Hormel & Co.*,
723 F.2d 1573 (Fed. Cir. 1983) .......... 27

*Commil USA, LLC v. Cisco Sys., Inc.*,
135 S. Ct. 1920, 1930 (2015) .......... 24

*ConnecTel, LLC v. Cisco Sys., Inc.*,
391 F. Supp. 2d 526 (E.D. Tex. 2005) .......... 34, 41, 43

*Cybor Corp.* v. *FAS Techs., Inc.*,
138 F.3d 1448 (Fed. Cir. 1998) .......... 23, 37

*David. B. Lil Co., Inc. v. Fisher*,
800 F. Supp. 1203 (D. Del. 1992) .......... 44, 53

*Forest Labs., Inc. v. Abbott Labs.*,
339 F.3d 1324 (Fed. Cir. 2003) .......... 48

*Fox v. Vice*,
131 S. Ct. 2205 (2011) .......... 40

*Hall v. Secretary of Health and Human Services*,
640 F.3d 1351 (Fed. Cir. 2011) .......... 22

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010) .......... 25

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*,
134 S. Ct. 1744 (2014) .......... 22, 23

*Katz v. Lear Siegler, Inc.*,
909 F.2d 1459 (Fed. Cir. 1990) .......... 31

*Kilopass Tech. v. Sidense Corp*,
738 F.3d 1302 (Fed. Cir. 2013) .......... 31

*MarcTec, LLC v. Johnson & Johnson*,
664 F.3d 907 (Fed. Cir. 2012) .......... 45, 48

*Mathis v. Spears*,
857 F.2d 749 (Fed. Cir. 1988) .......... 24, 43

*In re Microsoft Corp.*,
630 F.3d 1361 (Fed. Cir. 2011) .......... 25

*In re Nintendo Co., Ltd.*,
589 F.3d 1194 (Fed. Cir. 2009) .......... 8, 9

*Nystrom v. TREX Co., Inc.*,
339 F.3d 1347 (Fed. Cir. 2003) .......... 47

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
134 S. Ct. 1749 (2014) .......... 24, 25, 26, 28

*Oplus Techs., Ltd. v. Vizio, Inc.*,
782 F.3d 1371 (Fed. Cir. 2015) .......... 26

*Raylon LLC v. Complus Data Innovations, Co.*,
No. 6:09-cv-335, slip op. (E.D. Tex. May 4, 2015) .......... 43

*Refco Group Ltd., LLC, v. Cantor Fitzgerald, LP*,
No. 13 Civ. 1654, 2014 WL 2610608 (S.D.N.Y. June 10, 2014) .......... 53

*Roadway Exp., Inc. v. Piper*,
447 U.S. 752 (1980) .......... 56

*STMicroelectronics, Inc. v. Motorola, Inc.*,
308 F. Supp. 2d 754 (E.D. Tex. 2004) .......... 33

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
726 F.3d 1306 (Fed. Cir. 2013) .......... 45, 47, 55

*Taylor Brands, LLC v. GB II Corp.*,
627 F.3d 874 (Fed. Cir. 2010) .......... 47

*VE Holding Corp. v. Johnson Gas Appliance Co.*,
917 F.2d 1574 (Fed. Cir. 1990) .......... 29

*View Eng'g, Inc. v. Robotic Vision Sys., Inc.*,
208 F.3d 981 (Fed. Cir. 2000) .......... *passim*

**Statutes**

28 U.S.C. § 1292 .......... 48

28 U.S.C. § 1295 .......... 5

28 U.S.C. § 1404 .......... 3, 29, 30

28 U.S.C. § 1927 .......... 56

35 U.S.C. § 112 .......... 16, 17

35 U.S.C. § 285 .......... *passim*

## TABLE OF ABBREVIATIONS AND GLOSSARY

*Parties*

| | |
|---|---|
| Nintendo | Appellants/Cross-Appellees Nintendo Co., Ltd. and Nintendo of America Inc., collectively. |
| UltimatePointer | Appellee/Cross-Appellant UltimatePointer, LLC |

*Defined Terms*

| | |
|---|---|
| A____ | Joint Appendix page(s). |
| ’321 Patent | U.S. Patent No. 7,746,321 |
| ’729Patent | U.S. Patent No. 8,049,729 |
| Court | United States Court of Appeals for the Federal Circuit, or the Supreme Court of the United States, according to context. |
| court, district court, or Washington district court | United States District Court for the Western District of Washington |
| Nintendo Wii, Sensor Bar, Wii Remote, Wii System | Accused products that are manufactured or developed by Nintendo |

* Unless noted otherwise, all emphasis in quotations has been added.

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Nintendo states as follows:

(a) This civil action in the district court was previously before this or any other appellate court only in the following appeals:

- *In re Nintendo Co., Ltd. et al.*, 544 F. App'x 934 (Fed. Cir. 2013) (nonprecedential), panel of Alan D. Lourie, Kathleen M. O'Malley, and Jimmie V. Reyna, Circuit Judges.

- *UltimatePointer, L.L.C. v. Nintendo Co., Ltd. and Nintendo of America Inc.*, No. 15-1297.

(b) Nintendo is not aware of any other case that will be directly affected by the Court's decision in this case, other than the following cases:

- *UltimatePointer, L.L.C. v. Nintendo Co., Ltd. et al.*, No. 6:11-CV-00496 (E.D. Tex., filed September 15, 2011); and

- *UltimatePointer, L.L.C. v. Nintendo Co., Ltd. et al.*, No. 6:11-CV-00571 (E.D. Tex., filed November 1, 2011).

  These cases have been stayed by the district court.

## INTRODUCTION

UltimatePointer and its counsel kept this case in the Eastern District of Texas for two and a half years through tactics that that court condemned as "not in the interests of justice, but contrary to it." Their tactics included manipulating joinder and venue laws, accusing *en masse* more than 1,700 products they never acquired or analyzed, and refusing seven times to provide adequate infringement contentions that would have exposed their lack of pre-suit investigation. UltimatePointer and its counsel also continued to press their infringement case for eighteen months after claim construction confirmed that the claims required a feature the inventor and sole owner of UltimatePointer repeatedly told many different parties was missing from the accused products. Despite all this, the Washington district court—which received the case on transfer and had not presided over it during UltimatePointer's procedural maneuvers—found only one portion of UltimatePointer's conduct exceptional. It awarded Nintendo just $34,000 in fees, which is less than one-half-of-one-percent of the fees Nintendo incurred as a result of UltimatePointer's conduct. That award not only fails to compensate Nintendo for the expenses it suffered, but also signals that such tactics risk no financial consequences. This was an abuse of discretion.

The Washington district court should have found the case exceptional and awarded attorney's fees on three independent bases, but it committed legal and factual errors as to each:

First, the district court did not award any attorney's fees based on UltimatePointer's manipulation of venue and joinder laws despite the Eastern District of Texas's conclusion that UltimatePointer's venue tactics were against "the interests of justice." Instead, the Washington district court denied fees because it found venue technically proper in Texas. But whether venue met the low threshold of being *proper* under 28 U.S.C. § 1391 was never the issue. Venue was far more *convenient* in the Western District of Washington, requiring transfer under § 1404(a), but UltimatePointer deliberately obscured that fact for over two years. The district court abused its discretion by ignoring UltimatePointer's procedural gamesmanship. Plaintiffs and their attorneys acting against the interest of justice must, almost by definition, be "exceptional."

Second, the district court awarded only $34,000 for UltimatePointer's "bad faith, vexatious, wanton, and . . . oppressive" accusal of 1,700+ products without any investigation. The district court failed to award fees for UltimatePointer's repeated submission of deficient infringement contentions and refusal to answer discovery requests directed to its pre-suit investigation—conduct that the Eastern District of Texas found to warrant § 285 consideration. While the district court correctly found the case to be exceptional for this failure, the award of only fees "dedicated *solely* to the 1,700+ products" was the wrong measure. The award failed to account for how UltimatePointer's massive expansion of the case increased Nintendo's expenses in many areas, including increased coordination with the retailer defendants, assessment

of potential damages associated with the expanded infringement contentions, and multiple motions to compel.  Simply put, UltimatePointer's baseless accusation of an additional 1,700 products cost Nintendo much more than $34,000, and the district court abused its discretion by failing to recognize that fact.

Finally, the district court failed to award fees based on UltimatePointer's continued, vigorous pursuit of infringement long after claim construction rendered its claims meritless.  The district court misunderstood the law, suggesting that UltimatePointer had no obligation to stop pursuing its claims even after claim construction "put victory out of reach."  The district court compounded that error by wrongly suggesting that the defendant, not the plaintiff, is responsible for ending litigation once the outcome is foreclosed.  The district court accordingly never actually addressed the fact that, once the Eastern District of Texas issued its claim construction, UltimatePointer knew its infringement claims were meritless.  That knowledge is evidenced by statements UltimatePointer made through its sole owner and named inventor Erik Banning that the Nintendo Wii does not perform direct pointing, but is instead "approximate in its pointing."  By not awarding fees based on this conduct, the district court abused its discretion a third time.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1295(a)(1), because the parties timely appealed the district court's final order granting in part and denying in part Defendants' motions for attorney's fees under 35 U.S.C. § 285.

## STATEMENT OF THE ISSUES

1. Did the district court abuse its discretion by not awarding attorney's fees for UltimatePointer's manipulation of venue laws to improperly maintain venue in the Eastern District of Texas for over two years—actions Chief Judge Davis expressly held to be "contrary" to "the interest of justice"?

2. Did the district court abuse its discretion by awarding only a small fraction of the attorney's fees incurred as a result of UltimatePointer's "bad faith, vexatious, wanton, and . . . oppressive" conduct in adding more than 1,700 accused products to the case without conducting any investigation and by refusing to award fees for UltimatePointer's repeated failure to comply with the Eastern District of Texas's local patent rules?

3. Did the district court abuse its discretion by not awarding attorney's fees for UltimatePointer's continued pursuit of its infringement allegations after the claims were construed to require features that UltimatePointer's founder knew and repeatedly acknowledged were missing from the accused products?

## STATEMENT OF THE CASE AND FACTS

The litigation underlying this appeal involved an unsuccessful claim of patent infringement brought by Plaintiff-Cross Appellant UltimatePointer L.L.C. ("UltimatePointer") against Defendants-Appellants Nintendo Co., Ltd. and Nintendo of America Inc. (collectively, "Nintendo"). This appeal concerns only the district

court's resolution of Nintendo's motion for attorney's fees, which was based on: (1) UltimatePointer's improper attempts to manipulate venue to remain in the Eastern District of Texas, (2) UltimatePointer's failure to perform infringement analyses of the accused products or provide adequate infringement contentions setting forth coherent infringement theories, and (3) UltimatePointer's continued insistence on a trial far beyond the point it could possibly have had any viable claim of infringement. Relevant facts concerning the parties, asserted patents, and Nintendo's technology are discussed in Nintendo's response brief in the companion appeal on the merits of the infringement case, No. 15-1297. *See* Resp. Br. of Defendants-Appellees Nintendo Co., Ltd. and Nintendo of America Inc., Case No. 2015-1297, at 7-19, May 14, 2015, Electronic Case Filing No. 27 ("Nintendo's Resp. Br."). This brief focuses on UltimatePointer's litigation misconduct.

UltimatePointer filed the first lawsuit on September 15, 2011, charging infringement by Nintendo and various retailers that sell Nintendo products. UltimatePointer alleged that "Nintendo Wii systems, games, and related accessories" infringe United States Patent No. 7,746,321 ("the '321 Patent"). UltimatePointer filed a second lawsuit on November 1, 2011, accusing the same defendants of infringing a continuation of the '321 Patent, United States Patent No. 8,049,729 ("the '729 Patent").

### A. UltimatePointer's Inclusion of Retailer Defendants

UltimatePointer's original complaint accused only Nintendo products of infringement. A330; A12738; *In re Nintendo Co., Ltd.*, 544 F. App'x 934, 937 (Fed. Cir. 2013). This litigation was about Nintendo's products and nothing else. But UltimatePointer and its attorneys were determined to maintain the suit in the Eastern District of Texas even though neither UltimatePointer nor Nintendo has any meaningful connection to that district. A708; A19979.[1]

Including retailers headquartered either in Texas—such as GameStop and Dell Inc.—or the eastern half of the United States—such as Wal-Mart and Target—gave UltimatePointer a nominal basis to avoid transfer. *See* A12747. Meanwhile, UltimatePointer conspicuously excluded retailers based in the western United States. *See id.* ("Tellingly, UltimatePointer did not accuse other major retailers like Amazon.com, Costco, Fry's, or eBay, which are located in Washington and California."). The map below, showing the geographic locations of the various

[1] UltimatePointer is a Delaware company with its principal place of business in Houston, Texas, located in the Southern District of Texas. A708. Nintendo Co., Ltd. is a Japanese corporation with its headquarters in Kyoto, Japan. *Id.* And Nintendo of America Inc. is a Washington corporation with its headquarters and principal place of business in Redmond, Washington. *Id.* This Court set forth most of these and other relevant facts six years ago in its opinion in *In re Nintendo Co., Ltd.*, 589 F.3d 1194, 1196-1200 (Fed. Cir. 2009) (granting mandamus on venue transfer).

defendants (Nintendo being number "1"), illustrates UltimatePointer's initial attempts to secure venue in this case:[2]

Because the retailer defendants' liability hinged solely on Nintendo's liability as a manufacturer, they added nothing to the case against Nintendo other than a venue argument. A711; A19982.[3]

**B. UltimatePointer Accused Non-Nintendo Products To Avoid Severance and Transfer.**

On January 20, 2012, the defendants jointly moved to sever and stay claims against the retailers and to transfer claims against Nintendo. A116; A19973. Rather

---

[2] UltimatePointer's complaints also included allegations against Colorado-based JJ Games, LLC, but UltimatePointer stipulated to dismissal of that party early in the case.

[3] The retailers are not involved in the design, development, or manufacture of the accused products. A710; A19982; A1434. And Nintendo agreed to indemnify the retailers for the Nintendo products in this case if the court were to impose liability based on those products.

than dispute that its claims against the retailers were peripheral to its claims against Nintendo, UltimatePointer accused new products (made by other manufacturers but sold by the retailers) and asserted—for the first time—that it was accusing "different products with different bases of liability." A1147; A20005; *see also* A1375; A20018. UltimatePointer argued the new claims made the retailers more than "peripheral." A1147.[4] In total, UltimatePointer accused more than 2,000 different products manufactured or developed by more than 200 different companies. A1681; A2577-A2579; A2584-A2588; A2596-A2683. Only one of those manufacturers, Nintendo, was a named party. *Id.*

### C. The District Court Initially Denied Defendants' Motions to Sever. But This Court Granted A Writ Of Mandamus. The District Court Then Severed, Stayed, and Transferred.

The defendants moved to sever the retailers for misjoinder on August 3, 2012, because joinder of the non-party product claims violated Federal Rules of Civil Procedure 20 and 21, and the America Invents Act. A1691. The district court denied those motions on March 27, 2013. A5741-A5742.[5] Nintendo and the retailers petitioned this Court for a writ of mandamus, which was granted on September 25, 2013. A8852.

---

[4] UltimatePointer later amended its complaints in an attempt to reflect this broader scope. *Compare* A640-A641 *with* A2124-A2125.

[5] UltimatePointer caused the district court to base "its rulings solely on whether joinder was permissible under Rule 20 and 18" of the Federal Rules of Civil Procedure. *See* A8864

By the time the district court reconsidered the motions to sever and stay on remand, UltimatePointer had dropped all but eight of the 19 retailer defendants.[6] With a more fully developed record, Judge Davis reversed his earlier ruling:

> [T]he litigation tactics UltimatePointer has employed in an attempt to maintain venue in this District are now in clearer focus. Those tactics have not supported the interests of justice. Defendants have had to wait nearly two and a half years to have their motion to transfer properly heard. That significant delay arose from this Court's reliance on UltimatePointer's justification for venue in this District . . . . *UltimatePointer's tactics are not in the interest of justice, but contrary to it.*

A12747. Judge Davis transferred the case against Nintendo to the Western District of Washington and stayed the remaining cases against the retailers. A12753.

### D. UltimatePointer's Infringement Contentions

While the defendants awaited resolution of the motions to sever, stay, and transfer, the parties engaged in fact discovery in the Eastern District of Texas. Throughout that time, UltimatePointer repeatedly failed to abide by that court's Local Patent Rules.

UltimatePointer failed to comply with Eastern District of Texas Local Patent Rule 3-1(c) when it served its original plaintiff's infringement contentions ("PIC") on June 8, 2012, asserting a total of 23 claims of the '321 and '729 patents. That Rule requires plaintiffs to serve infringement contentions including a "chart identifying

[6] Of the remaining eight, it sought damages from only GameStop and Wal-Mart.

specifically where each element of each asserted claim is found within each Accused Instrumentality." Local Patent Rule 3-1(c) (E.D. Tex.). UltimatePointer made no effort to do this. Because the original PICs were deficient, defendants insisted that UltimatePointer amend them. This began a series of deficient contentions and accompanying motions.

#### 1. UltimatePointer's First Amended Infringement Contentions.

UltimatePointer's first amended infringement contentions ("1st AICs") on September 9, 2012, still failed to satisfy Local Patent Rule 3-1. UltimatePointer failed to chart where each element of each asserted claim was found within even a single accused product or product combination, even though the 1st AICs identified more than 2,000 allegedly infringing products (resulting in over 37,000 possible product combinations that needed to be analyzed for infringement). A2554. Instead, UltimatePointer took a shortcut: it provided two "claim charts" (one for each patent) charting a non-specific, allegedly "representative" product filled with vague descriptions of the alleged infringement —a manner of charting that rarely satisfies Rule 3-1. A2560-A2566.[7] As a result, Nintendo moved to enforce Patent Rule 3-1 on November 11, 2012. A2551.

---

[7] UltimatePointer's disclosure failed to even allege that the supposedly "representative" products were structurally or functionally representative of the accused Nintendo products or the 1,700+ accused non-party products developed by some 200 non-party companies.

#### 2. UltimatePointer's Second Amended Infringement Contentions.

UltimatePointer opposed Nintendo's motion on December 11, 2012, and served its second amended infringement contentions ("2nd AICs"). The 2nd AICs changed UltimatePointer's infringement theories yet again, particularly regarding the '729 patent's "image sensor" term (a central term at issue in the companion appeal). *Compare* A4952 at A4956-A4957, *with* A4971 at A4974-A4975, *and* A4991 at A4994-A4995 (comparing original, first, and second proposed supplemental infringement claim charts for '729 patent, respectively).

#### 3. UltimatePointer's Third Amended Infringement Contentions.

At the same time that he issued his *Markman* rulings, Judge Davis granted Defendants' Motion to Enforce Patent Rule 3-1. A5960. UltimatePointer then served its third amended infringement contentions ("3rd AICs") on June 14, 2013. UltimatePointer's contentions were still deficient at least because they failed to explain how the "image sensor" limitations were satisfied and failed to cite source code to explain how the accused products purportedly performed the required functionality. After UltimatePointer refused to provide missing information, Defendants filed their first Motion to Strike P.R. 3-1 Infringement Contentions on August 26, 2013. A6987. The Court granted that motion in part on November 15, 2013, ordering UltimatePointer to supplement its infringement contentions to, among other things,

cite the source code that UltimatePointer alleged performed the required functionality. A10597-A10598.

**4. UltimatePointer's Fourth Amended Infringement Contentions.**

Before following the court's order, UltimatePointer served fourth amended infringement contentions ("4th AICs") in response to the court's supplemental construction of the claim term "spatial state." The 4th AICs made no changes regarding the '729 patent claims, but dropped numerous '321 patent claims (those requiring "spatial state") and made slight changes for claim 12 of the '321 patent, the sole remaining asserted claim of the '321 patent.

**5. UltimatePointer's Fifth Amended Infringement Contentions.**

UltimatePointer served the Court-ordered fifth amended infringement contentions ("5th AICs") on December 13, 2013. Despite Defendants' repeated requests, the 5th AICs still did not cite source code and did not fully explain UltimatePointer's infringement theories. Defendants therefore filed their Second Motion to Strike P.R. 3-1 Infringement Contentions on December 24, 2013—just two weeks before opening expert reports. A10608.

Judge Davis granted the second motion in part. A12682. He found that UltimatePointer's 5th AICs were deficient for claim 12 of the '321 patent but decided to "allow UltimatePointer to amend its contentions, even though their deficiencies might otherwise warrant a harsher result." A12686. Judge Davis then admonished UltimatePointer:

> The Court will consider UltimatePointer's inability to articulate coherent infringement contentions even after several amendments when it evaluates Defendants' claim that this is an exceptional case under 35 U.S.C. § 285.

*Id.* Judge Davis also considered UltimatePointer's continued failure to provide source code citations, and found that "UltimatePointer's contentions do not provide Defendants with adequate notice of UltimatePointer's theories of infringement." A12688. He then repeated his admonishment that the court would consider this conduct "when it evaluates Defendants' claim that this is an exceptional case under 35 U.S.C. § 285." *Id.*

**6. UltimatePointer's Sixth Amended Infringement Contentions.**

UltimatePointer served its sixth amended infringement contentions ("6th AICs") on June 16, 2014—three months after the close of expert discovery.

**E. Defendants' Summary Judgment Motions**

Nintendo sought leave for and filed four separate motions for summary judgment to dispose of UltimatePointer's patent claims.

Eastern District of Texas practice allows defendants to move for summary judgment on indefiniteness under 35 U.S.C. § 112 during the *Markman* process. *See* A1655 (Docket Control Order). Nintendo did so, challenging multiple claims as invalid for *IPXL*-type indefiniteness. A4407. Judge Davis granted in part Nintendo's motion, ruling that five claims of the '321 patent were invalid because they were indefinite. A5956-A5957.

Judge Davis's default rules forbade filing any additional summary judgment motions until after the close of expert discovery. Even then, such motions could be filed only with leave on an issue-by-issue basis. Nintendo therefore asked Judge Davis for permission to file an early summary judgment motion on a narrow issue. A5895. Judge Davis, agreed, allowing Nintendo to seek summary judgment of non-infringement on claim 47 of the '321 patent. A6027-A6028. That claim was particularly appropriate for summary judgment because it was the sole source of UltimatePointer's claims for more than 90% of the accused products. *Id.* The motion was based on the Wii system's inability to determine the Wii Remote's "spatial state." A6099.

To decide that motion, Judge Davis issued a supplemental claim construction order that addressed the term "spatial state." A10403. He then granted Nintendo's motion for non-infringement of claim 47. A10427. The number of accused products immediately dropped by more than 90%, and UltimatePointer also dropped all other claims requiring "spatial state" determinations.

This Court granted mandamus on September 25, 2013, six weeks before Judge Davis' grant of summary judgment. Because expert discovery was imminent, seeking leave to file a second early motion for summary judgment in Texas did not seem appropriate—especially when the defendants anticipated a quick transfer. Ultimately, transfer did not occur quickly and thus Nintendo followed the schedule and filed five letter briefs before Judge Davis on March 14, 2014, seeking leave to file motions for

summary judgment on several issues, including noninfringement.  A11980, A12009, A12021, A12028, A12034.  Thereafter, Judge Davis ordered transfer without ruling on the letter briefs.  Nintendo was never permitted to file additional summary judgment motions in Texas.

The case against Nintendo was transferred to the Western District of Washington on June 17, 2014, and assigned to Judge Robert Lasnik.  UltimatePointer moved for partial summary judgment on two issues: alleged invalidity and equitable defenses.  A13382.  Nintendo cross-moved for summary judgment of noninfringement of all remaining asserted claims.  A13760.  Nintendo also cross-moved for partial summary judgment of invalidity based on *IPXL*-type indefiniteness of four claims.  A15226 n.7.

Judge Lasnik granted Nintendo's motion for summary judgment of non-infringement of all remaining asserted claims on December 22, 2014.  A17168.  He also ruled that claims 1, 3, 5, and 6 of the '729 patent were invalid for indefiniteness.  A17144.  The parties stipulated to the dismissal without prejudice of Nintendo's invalidity counterclaims regarding claim 12 of the '321 patent and claim 12 of the '729 patent.  A17179.

Following Judge Lasnik's grants of summary judgment, Nintendo moved for attorney's fees, arguing that:

    1.  UltimatePointer improperly sought to manipulate venue;

2. UltimatePointer failed to properly analyze the accused products and obscured its infringement theories; and

3. UltimatePointer pursued this case in bad faith following claim construction.

A17283, at A17290-A17298.

In his ruling on that motion, Judge Lasnik declined to find the case exceptional based on the first and third arguments. A3-A4. And while he agreed that the case was exceptional due to the 1,700 accused products UltimatePointer failed to acquire or analyze, he awarded only $34,000 in fees (a small fraction of the amount sought). A4-A5. Nintendo appeals that order, and UltimatePointer cross-appeals from both that order and the clerk of court's order taxing costs. A6-A7.

## SUMMARY OF ARGUMENT

UltimatePointer chose to file this case in the Eastern District of Texas. Because of UltimatePointer's strategic maneuvering around joinder and venue laws, the case improperly remained in that district for two and a half years. As a result, the overwhelming majority of UltimatePointer's conduct giving rise to this appeal occurred during that time. Yet the Western District of Washington was tasked with deciding whether attorney's fees should be awarded to Nintendo. In reaching its decision, the court made several errors of law and fact and thereby abused its discretion.

I. The district court abused its discretion by not awarding fees for UltimatePointer's improper attempts to manipulate venue. This case was—at its

core—between UltimatePointer and Nintendo, neither of which resided or had any significant presence in the Eastern District of Texas. UltimatePointer nonetheless tried to maintain venue by strategically adding 19 retailers to the case for no apparent reason other than to anchor the case in Texas. UltimatePointer then doubled down on this effort by adding thousands of non-party products to prevent the district court from severing the retailers and transferring the case Nintendo case to Washington. Following a grant of mandamus by this court, and following a number of experiences with UltimatePointer and its counsel, Judge Davis condemned these abusive tactics as "contrary" to the "interest of justice." The Washington district court made no attempt to reconcile its denial of fees with Judge Davis's condemnation, but instead relied on incorrect understandings of the Texas proceedings and an incomplete understanding of the full extent of UltimatePointer's conduct.

II. The district court abused its discretion by awarding only a small fraction of the fees that Nintendo incurred because of UltimatePointer's failure to comply with the local patent rules of the Eastern District of Texas. UltimatePointer and its counsel failed to analyze the accused products as required by law. Indeed, they did not even acquire more than 1,700 of the roughly 2,000 accused products before filing this case and serving infringement contentions. This failure made UltimatePointer unable or unwilling to provide adequate infringement contentions. Nintendo was forced to conduct unguided analysis of the potential risk in the case and to file numerous contentions-related motions, all the while incurring fees defending these

licensed products.  Although the district court awarded a small amount of fees based on this conduct, the court failed to fully appreciate the extent and scope of this misconduct or to sufficiently deter such tactics.

III.    The district court abused its discretion by failing to award fees for UltimatePointer's maintenance of this case more than a year after claim construction rulings foreclosed the outcome.  Dr. Banning, UltimatePointer's owner and sole inventor of the patents, repeatedly told Nintendo, potential business investors, and even the Scottish government that the Wii was fundamentally different from his patents because it did not perform "direct pointing."  When Judge Davis construed the asserted claims to require "direct pointing," that should have been the end of the district court case.  The district court never evaluated whether the claims became meritless, however, because the court instead incorrectly found that a plaintiff is not obligated to drop claims once they become meritless, and improperly shifted the responsibility to dismiss such claims from the plaintiff to the defendant.

IV.    UltimatePointer's counsel should be held jointly and severally liable for all fees awarded.  This is especially important given that UltimatePointer apparently has no assets other than the patents-in-suit and related applications, and thus would be unable to satisfy any fee award.

## STANDARD OF REVIEW

All aspects of a district court's determination under 35 U.S.C. § 285 are reviewed for abuse of discretion.  *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S.

Ct. 1744, 1749 (2014). This is because the district court is—almost always—most familiar with the parties' litigation conduct. *See, e.g., Highmark*, 134 S. Ct. at 1748 ("[T]he district court 'is better positioned' to decide whether a case is exceptional, because it lives with the case over a prolonged period of time."); *Hall v. Secretary of Health and Human Services,* 640 F.3d 1351, 1356 (Fed. Cir. 2011) ("[T]he district court was better positioned than the appellate court to decide [the attorney's fees issue] because it was intimately familiar with all the facts before it.").

This case is different. The court that "lived with the case over a prolonged period of time" and was most familiar with UltimatePointer's conduct was the Texas district court, not the Washington court that ruled on fees. Whereas the Washington court dealt with the case for five months while learning and evaluating the parties' summary judgment motions, Judge Davis presided over the case for the preceding two and a half years, becoming familiar with the conduct giving rise to Nintendo's fees request. Discovery had been closed for more than six months when the Washington court received the case. The Washington court therefore had to decide the fees issue without having actually been involved with the relevant activity. The court's familiarity with UltimatePointer's conduct was significantly less than a district court would typically have at that stage of litigation and—unlike in most appeals concerning § 285—no greater than that of this Court.

Moreover, the abuse of discretion standard "does not preclude an appellate court's correction of a district court's legal or factual error: 'A district court would

*necessarily* abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Highmark*, 134 S. Ct. at 1748 n.2 (emphasis added); *see also Nilseen v. Osram Sylvania, Inc.*, 528 F.3d 1352, 1357 (Fed. Cir. 2008) (under 35 U.S.C. § 285, an abuse of discretion occurs "when [the district court's] decision is based on clearly erroneous findings of fact, is based on erroneous interpretations of the law, or is clearly unreasonable, arbitrary, or fanciful.").

In this case, the Washington district court's lack of familiarity with UltimatePointer's conduct led that court to make significant errors. As shown below, those errors were compounded by additional legal errors, as to which the district court had no discretion.

## ARGUMENT

In addition to a court's inherent powers, Section 285 of the Patent Act authorizes courts to award attorney fees in exceptional cases "to compensate the prevailing party" for their "monetary outlays in the prosecution or defense of the suit." *Automated Bus. Co. v. NEC America, Inc.*, 202 F.3d 1353, 1355 (Fed. Cir. 2000). Fee-shifting statutes also play an essential role in "deterr[ing]" meritless litigation—a role that is particularly important to patent litigation, as the Supreme Court and this Court have acknowledged. *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749, 1755-56 and n.6 (2014); *see Automated*, 202 F.3d at 1355 ("§ 285 serves as a deterrent to improper bringing of clearly unwarranted suits for patent infringement.'") (quotations omitted); *see also Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1930

(2015) (noting deterrence value of awarding attorney's fees under § 285 to prevent frivolous cases). Indeed, § 285 is "[t]he only deterrent" to baseless patent suits. *Mathis v. Spears*, 857 F.2d 749, 754 (Fed. Cir. 1988).

"[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness*, 134 S. Ct. at 1756. Under this standard, "a district court may award fees in the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." *Id.* at 1756-57. This standard encompasses all "unreasonable conduct," and it empowers the court to "determine whether a case is 'exceptional' in the case-by-case exercise of [its] discretion, considering the totality of the circumstances." *Id.* at 1756. Those circumstances may include, for example, "'"frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."'" *Id.* at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)). Any one circumstance can be enough to warrant a fee award: "a case presenting *either* subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.* at 1757.

## I. THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO AWARD FEES BASED ON ULTIMATEPOINTER'S IMPROPER ATTEMPTS TO MANIPULATE VENUE.

"The Supreme Court has long urged courts to ensure that the purposes of jurisdictional and venue laws are not frustrated by a party's attempt at manipulation." *In re Microsoft Corp.*, 630 F.3d 1361, 1364 (Fed. Cir. 2011); *see also Hertz Corp. v. Friend*, 559 U.S. 77, 97 (2010). In this case, UltimatePointer's unreasonable tactics to keep venue in the Eastern District of Texas forced Nintendo to struggle through thousands of baselessly accused products made by hundreds of different manufacturers; file multiple rounds of briefing to sever and transfer, including a mandamus petition to this Court; pay for the defense of numerous retailers participating throughout the discovery process (including on the aforementioned products); and wait two-and-a-half years to finally obtain transfer. That conduct easily makes this case one that "stands out." That is all the Supreme Court requires. *See Octane*, 134 S. Ct. at 1756 ("[A]n 'exceptional' case is simply one that stands out from others with respect to . . . the unreasonable manner in which the case was litigated."); *see also Oplus Technologies, Ltd. v. Vizio, Inc.*, 782 F.3d 1371, 1372 (Fed. Cir. 2015) (finding district court abused discretion by denying fees based on conduct that included plaintiff "'strategically amending its claims to manufacture venue'").

The Texas district court, in fact, recognized that UltimatePointer's actions were "not in the interest of justice, but contrary to it." A12747. A case in which a party or its counsel acts against the interests of justice must, almost by definition, be

exceptional. Indeed, "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." ABA Model Rule 8.4 ("Misconduct"). If such cases do not "stand out" as extraordinary, the judicial system could not function.

Nonetheless, the Washington court denied Nintendo's motion for fees on that basis in only three sentences:

> Defendants have not shown that plaintiff's choices regarding venue . . . violated a court order, were in bad faith, or are otherwise "exceptional." Venue was proper in Texas, and plaintiff's claims against the various defendants were not meritless. The fact that plaintiff voluntarily dismissed many of the defendants after discovering that their market share and/or sales did not justify further litigation does not necessarily mean that the claims were brought in bad faith or are otherwise sanctionable.

A2. This decision constitutes an abuse of discretion for the reasons described below.

### A. The District Court's Decision Was Inconsistent With The Eastern District Of Texas's Findings.

The court's conclusion that UltimatePointer's conduct was not "in bad faith" or "otherwise 'exceptional'" conflicts with Judge Davis's earlier findings. Judge Davis oversaw this case from its inception, through multiple sets of briefing and multiple hearings, and the eventual transfer to Washington. Further, as then-Chief Judge of the Eastern District of Texas, Judge Davis was uniquely familiar with the local rules and complex patent cases and was well-versed in the tactics plaintiffs employ to maintain venue in Texas. Drawing from that experience and his knowledge of this specific case, Judge Davis condemned UltimatePointer's tactics. A12747. The

Washington court made no attempt to reconcile its decision with that finding or explain how litigation tactics "contrary" to "the interest of justice" do not either constitute bad faith or make this case "stand out." *See Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1580 (Fed. Cir. 1983) (law of the case doctrine "expresses the practice of courts generally to refuse to reopen what has been decided"). To deny attorney's fees for such conduct is an abuse of discretion.

### B. The District Court's Decision Was Inconsistent With Its Own Findings Regarding The Improper Inclusion Of More Than 1,700 Accused Products Without Any Investigation.

The Washington court's ruling on venue manipulation contradicts its own ruling on the adequacy of UltimatePointer's pre-litigation analysis. The court found that "plaintiff's claims against the various defendants were not meritless." A2. But in the same order, the court found that many of UltimatePointer's claims *were* meritless. UltimatePointer's claims were meritless as to, at a minimum, the 1,700 accused products UltimatePointer accused without acquiring or analyzing. A3-A4.

UltimatePointer's "gratuitous addition" of those accused products was a critical part of UltimatePointer's strategy to maintain venue in East Texas. When Nintendo moved to sever, UltimatePointer added a veritable mountain of other products to the case through UltimatePointer's initial infringement contentions, including the 1,700 unanalyzed games, to make the Retailers non-peripheral. As Judge Davis observed, UltimatePointer frustrated transfer when it "used the presence of those added claims

to argue that the case against Nintendo should not be severed" from the case against the Retailers. A12747.

While the Washington court correctly found UltimatePointer's addition of those products to have been "in bad faith, vexatious, wanton, and . . . for oppressive reasons," A4, the court failed to recognize and address how that conduct overlapped with UltimatePointer's efforts to prevent transfer out of Texas. But for the bad faith inclusion of these products, the Eastern District of Texas would have (i) severed and stayed the retailers, and (ii) transferred Nintendo to the Western District of Washington at the outset of the case. Instead, the inclusion of these products delayed severance and transfer for over two years. Courts should consider the "totality of the circumstances" in determining whether case is "exceptional." *Octane Fitness*, 134 S. Ct. at 1756. To not award fees would allow UltimatePointer to evade responsibility for its conduct and to incentivize such conduct by other plaintiffs.

**C. The District Court Failed To Recognize The Full Scope Of UltimatePointer's Conduct.**

The Washington court also overlooked the full extent of UltimatePointer's conduct in Texas when it found "venue was proper in Texas, and plaintiff's claims against the various defendants were not meritless." A2. Whether "proper" venue exists is rarely at issue under the liberal standard in a patent case. *See VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1584 (Fed. Cir. 1990) (holding that corporation that is subject to personal jurisdiction in district is deemed to reside there

for venue purposes). To deny attorney's fees because venue was technically proper sets an unduly low bar. Instead, the operative issue is that UltimatePointer improperly delayed transfer to a more convenient venue under 28 U.S.C. § 1404(a).

Judge Davis eventually reconsidered the transfer motions, post-mandamus, in the spring of 2014, and recognized the years of strategic maneuvers by UltimatePointer and its counsel to keep the case in Texas. A12747 ("[T]he litigation tactics UltimatePointer has employed in an attempt to maintain venue in this District are now in clearer focus.").

- As Judge Davis explained, "UltimatePointer's original complaint accused only Nintendo products," but "neither UltimatePointer nor Nintendo had ties to" the Eastern District of Texas. *Id.*

- To prevent transfer, "UltimatePointer filed suit . . . alleging infringing acts against not only Nintendo, but also nineteen Retailers . . . located almost entirely in the eastern half of the country [while excluding] other major retailers . . . located in Washington and California." *Id.*

- "UltimatePointer then used the presence of the accused Retailers to argue that the case should not be transferred." *Id.*

- To prevent the court from severing the retailers as peripheral defendants, UltimatePointer "added claims against the Retailers regarding non-Nintendo products and used the presence of those added claims to argue that the case against Nintendo should not be severed." *Id.*

- UltimatePointer added the vast majority of the additional accused products without any meaningful pre-suit investigation of these other accused products—many of which were never even sold. A3-A4.

- UltimatePointer obscured its tactics and lack of adequate investigation by repeatedly refusing to provide sufficient infringement contentions under the Eastern District of Texas's local patent rules.

- Despite claiming that the retailers were "necessary" to the case, UltimatePointer readily dismissed (without any settlement) several of them as soon as the district court initially denied Nintendo's motions to sever, stay, and transfer, and did not seek damages (save for joint and several liability) from six of the eight retailer defendants that remained in-suit as of the close of expert discovery. *See, e.g.*, A5852; A10215; A10424-A10426.

Judge Davis recognized that those tactics forced Nintendo "to wait nearly two and a half years to have [its] motion to transfer properly heard." *Id.* Indeed, Nintendo first moved to sever and transfer the case to Washington on January 20, 2012. A701. UltimatePointer's tactics postponed transfer until June 17, 2014. As Judge Davis stated, that "significant delay arose from [the district court's] reliance on UltimatePointer's justification for venue" in the Eastern District of Texas. A12747.

This Court recognized on mandamus that the retailers added virtually nothing to the case:

> In all likelihood, the retailers will have very little to offer in the way of evidence regarding the substantive aspects of the infringement case. They can add little to nothing regarding how the technology underlying the accused products works. Indeed, we and other courts have all but said as much in the analogous context of the "customer suit exception," which endorses staying a case against a customer or retailer in light of the notion that the manufacturer is the "true defendant."

A8864-A8865. It is improper forum shopping for a plaintiff to name an insignificant party as a defendant in an action just to establish venue. *See Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990) (affirming severance of peripheral defendant). But that is exactly what UltimatePointer did.

### D.    UltimatePointer's Conduct Significantly Increased Nintendo's Litigation Costs.

UltimatePointer's improper venue-manipulation tactics were expensive for Nintendo.  "[T]he aim of § 285 is to compensate a defendant for attorneys' fees it should not have been forced to incur."  *Kilopass Tech. v. Sidense Corp*, 738 F.3d 1302, 1313 (Fed. Cir. 2013).  If a violation of § 285 causes a party to incur any fees at all, a fee award is appropriate.  *See id.*  Here, Nintendo incurred significant fees as a result of UltimatePointer's venue tactics.

As lead defendant and indemnitor of the retailers, Nintendo expended considerable time and money filing motions on the severance and venue issues and coordinating with the retailers to ensure that all Defendants met their collective discovery obligations.  And discovery was substantial: UltimatePointer served interrogatories on the retailers, requested documents from eleven of the retailers (including email discovery from eight of them), and deposed ten retailer witnesses.  Because UltimatePointer alleged infringement by Wii games developed and sold by approximately 200 non-party game developers, Nintendo and the retailer defendants spent significant time coordinating with those developers.  Nintendo's damages expert also spent considerable time analyzing the financial documents from the retailers.[8]

---

[8] Nintendo calculated that approximately $1,531,050 in attorneys' fees and $295,986 in costs are attributable to UltimatePointer's venue manipulation.  *See* A17659, at ¶¶ 17-23, 59-60, 62, and 69-71.

## II.    THE DISTRICT COURT ABUSED ITS DISCRETION BY UNDERVALUING THE IMPACT OF ULTIMATEPOINTER'S FAILURE TO INVESTIGATE.

To prevent the Texas district court from severing the retailers as peripheral defendants, UltimatePointer accused thousands of Wii-related products allegedly sold by the retailers.  The district court correctly found UltimatePointer's conduct to be "exceptional" as to those products, but it abused its discretion by finding that the vexatious addition of over 1,700 accused products caused a mere $34,000 in additional expenses for Nintendo—only $20 per improperly-accused product.  This conclusion flowed from two primary errors:  (1) the court limited the "exceptional case" finding to the 1,700 accused products that UltimatePointer failed to acquire or analyze, and (2) the court failed to recognize the full impact of the addition of those 1,700 accused products on Nintendo's litigation expenses.

### A.    The District Court Correctly Found That UltimatePointer Failed To Conduct An Adequate Pre-Litigation Analysis Of Most Of The Accused Products And Failed To Articulate Infringement Contentions Regarding Those Products.

UltimatePointer failed to comply with Rule 11 of the Federal Rules of Civil Procedure and the rules of the Eastern District of Texas in litigating this case. "Before filing []claims of patent infringement," Rule 11 "require[s] the law firm to, at a bare minimum, apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted." *View Eng'g,*

*Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000). Likewise, Eastern District of Texas Local Patent Rule 3-1(c) requires that the patent holder serve contention claim charts "identifying specifically where each element of each asserted claim is found within each Accused Instrumentality," and that the particular theories of infringement be set forth with "sufficient specificity to provide defendants with notice of infringement beyond that which is provided by the mere language of the patent [claims] themselves." *See STMicroelectronics, Inc. v. Motorola, Inc.*, 308 F. Supp. 2d 754, 755 (E.D. Tex. 2004); *see also ConnecTel, LLC v. Cisco Sys., Inc.*, 391 F. Supp. 2d 526, 527 (E.D. Tex. 2005) (local patent rules require patent plaintiffs to "formulate, test, and crystallize their infringement theories" before providing their infringement contentions).

UltimatePointer ignored these requirements. UltimatePointer and its counsel failed to acquire, much less analyze, the vast majority of accused products. Instead, UltimatePointer's counsel reviewed select Wii games and based their case on (1) outward manifestations of how the Wii operates, and (2) an assumption that all Wii games and software applications operate in a similar manner. A3-A4. That "investigation" fell short of what is required before launching a patent suit and caused inclusion of many games that had no place in this case. UltimatePointer not only guessed, but guessed wrong. For example, as the Washington district court observed, "certain games had never been released to the market and others were used with older

games systems that were incompatible with the pointing features of the Wii remote." A3.

Both because of and in addition to this mass inclusion of accused games, UltimatePointer also failed to provide proper infringement contentions. Eastern District of Texas Local Patent Rule 3-1(c) requires that the patent holder serve contention claim charts "identifying specifically where each element of each asserted claim is found within each Accused Instrumentality." UltimatePointer could not do this. It did not even have most of the accused games. Moreover, providing contentions for the few games it did acquire would have highlighted its lack of investigation. So UltimatePointer provided nothing of substance on any of the games. Its failure to acquire the accused products and corresponding need to obscure that fact caused the first four (of seven) rounds of contentions over the course of more than a year:[9]

Based on this conduct, the Washington district court correctly found that UltimatePointer's conduct was improper as to a large subset of those products, which UltimatePointer added without acquiring or otherwise investigating:[10]

---

[9] UltimatePointer's infringement contentions were gratuitously complicated and confusing. *See* A10626 (describing UltimatePointer's multi-part contentions); *see also* A12688.

[10] The Washington district court found that when UltimatePointer served its original infringement contentions, it "had acquired only 203 of the [1,912 accused] games, but deemed the other 1,700+ games substantially similar to the games in its possession. [UltimatePointer] was incorrect as a matter of both fact and law." A3.

> The Court finds that the unnecessary and unsupported addition of over 1,700 accused products with no attempt to substantiate the accusations was in bad faith, vexatious, wanton, and, in the absence of any reasonable justification for the expansion, deemed to be for oppressive reasons.

A3-A4. The court further found this misconduct made the case "exceptional" supporting an award of attorney's fees:

> Even in the high-stakes, high-cost context of patent litigation, this gratuitous addition of products was exceptional: it stands out from other case because of the substantive weakness of plaintiff's litigating position and the unreasonable and unnecessary burdens the expansion imposed on this litigation.

A4.

### B. The District Court Abused Its Discretion By Limiting The "Exceptional Case" Finding To The 1,700 Accused Products That UltimatePointer Failed To Acquire Or Analyze.

UltimatePointer did not comply with its ethical obligations or the Eastern District of Texas's patent rules even as to the other 203 products. Accordingly, while the court correctly found that UltimatePointer's conduct was in bad faith, the court abused its discretion when it denied attorneys' fees as to work that might also relate to the 203 other accused products. The court based that decision on a misunderstanding of the events. The court incorrectly believed that UltimatePointer's many amended infringement contentions over a two-year span were all attributable to claim construction rulings:

> With regards to the products that were in plaintiff's possession, defendants have shown only that plaintiff's infringement theories

> *were amended as the patent claims were construed and were ultimately rejected.* Neither fact establishes bad faith or an exceptional case.

A4 n.4 (emphasis added). This statement is incorrect.

Contrary to the Washington court's finding, only *one* set of UltimatePointer's *six* supplementations (the 4th AICs) was responsive to Judge Davis's claim construction. The others were required by UltimatePointer's repeated failure to comply with the district court's discovery rules; three were forced by court order.[11] The district court's reliance on this misunderstanding was an abuse of discretion.

A complete understanding of the events shows that UltimatePointer's misconduct went far beyond just the inclusion of the 1,700+ games. Before he transferred the case to Washington, Judge Davis twice admonished UltimatePointer that its ongoing conduct—long after the 1,700 games had been dropped—had opened the door to a potential award of attorney's fees down the road:

> The Court will consider UltimatePointer's inability to articulate coherent infringement contentions even after several amendments when it evaluates Defendants' claim that this is an exceptional case under 35 U.S.C. § 285.

A12686 *and* A12688. Judge Davis made this statement regarding UltimatePointer's 5th AICs, which were already limited to a subset of the 203 accused products acquired

[11] UltimatePointer made all five other supplementations either at Nintendo's insistence (the 1st and 2nd AICs) or to comply with Judge Davis's order following his granting a motion by Nintendo (the 3rd, 5th, and 6th AICs). The last supplementation was after the close of fact discovery and after expert discovery had commenced, making further litigation over those contentions meaningless.

by counsel.  He was thus not speaking to the 1,700+ products already dropped.  Judge Davis never had the opportunity to follow through with that statement when assessing fees because he transferred the case to Washington.

It was error for the Washington court to limit the fee award to only the deficiencies involving the 1,700 games because UltimatePointer's infringement contentions were also inadequate.  Those inadequacies were, in large part, driven by UltimatePointer's failure to conduct an adequate pre-suit investigation.  In addition to other problems, the contentions lacked citations to such source code—the best evidence of how the accused products operate.   In fact, a majority of the then-asserted claims expressly required computer-executable instructions (or a "processor … programmed to") to perform certain steps, making source code analysis indispensable.  *See* A295-A297; A336.

UltimatePointer's conduct caused Nintendo to incur additional expense.  This included filing two additional motions—both of which were granted at least in part—to force UltimatePointer to meet its obligation to review and cite source code (and thereby articulate a specific infringement theory for each accused product). *See* A6987, A7384, A10516, A10590, A10608.  UltimatePointer finally provided citations to source code for the first time only one week before the close of fact discovery.

### C.    The District Court Awarded Too Little For The 1,700 Accused Products That UltimatePointer Neither Acquired Nor Analyzed.

To the extent the court awarded fees based on the 1,700 accused games, the court still erred by substantially undervaluing the expenses that misconduct required. To determine what portion of Nintendo's attorneys' fees were "attributable to the presence of those 1,700+ products in this action," the court attempted to isolate expenses that were attributable solely to those products:

> A review of the letters, motions, and billing records between June 8, 2012, and June 14, 2013, shows that very little time was dedicated solely to the 1,700+ products. The deficiencies in the original infringement contentions were universal, and, for the most part, defendants addressed those deficiencies en masse.

A4.

The district court erred by finding that the 1,700+ improperly accused products affected only ten-percent of Nintendo's infringement contention efforts. For example, the district court looked only to time entries that were dedicated solely to those 1,700+ products. *Id.* In ignoring other entries in which Nintendo dealt with the infringement issues "en masse," *id.*, the district court failed to appreciate that such entries necessarily encompassed not only the "properly" accused products, but also the improperly accused products. The inclusion of many hundreds of products vastly increased the cost of understanding, much less analyzing, UltimatePointer's infringement charge. A more appropriate measure would have been to include all such time entries and reduce the overall amount proportionally based on the ratio

between the acquired and un-acquired accused products. Nintendo should have been awarded fees for, at a minimum, at least 85% (17/20ths) of that work.

Beyond requiring Nintendo to identify and review non-party claims, the mass inclusion of those games corrupted the entire discovery process. For more than a year and a half, UltimatePointer and its counsel used those "universal" deficiencies in their contentions to hide their failure to acquire or investigate the 1,700+ games. These "universal" deficiencies were thus a smoke screen and supported the award of attorney's fees for all of the actions Nintendo took to unveil UltimatePointer's subterfuge. *See Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011) (recognizing that "'but-for'" standard "may in some cases allow compensation to a defendant for attorney work relating to both frivolous and non-frivolous claims" and noting that "frivolous claims may increase the cost of defending a suit in ways that are not reflected in the number of hours billed"). To make matters worse, UltimatePointer refused to divulge when it acquired the accused products. It was not until Nintendo obtained two orders from the district court on motions to compel proper discovery responses that UltimatePointer finally revealed that it *never* acquired most of the accused products.

Uncovering UltimatePointer's misconduct was difficult and expensive. That conduct was fully exposed by the time this case arrived in Washington, but that was not always so. When UltimatePointer first served its Original Infringement Contentions on June 8, 2012, Nintendo had to assume that UltimatePointer had fully evaluated the 2,000 accused products because the precedents of this Court and the

Eastern District of Texas required UltimatePointer to do so. *See*, *e.g.*, *View Eng'g, Inc.*, 208 F.3d at 986 ("Before filing [claims] of patent infringement, Rule 11, we think, must be interpreted to require the law firm to, at a bare minimum, apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted."); *see also ConnecTel, LLC*, 391 F. Supp. 2d at 527 ("The Patent Rules demonstrate high expectations as to plaintiffs' preparedness before bringing suit, requiring plaintiffs to disclose their preliminary infringement contentions before discovery has even begun" and to state "specific theories of infringement.").

Nintendo thus expended significant time evaluating how each product supposedly fit into the infringement contentions and drafting letters identifying deficiencies in the Contentions (*see, e.g.*, A17368, A17380, A17382, A17386, A17397, A17406, A17409, A17412).[12] Nintendo had to hold multiple meet-and-confers to discuss those deficiencies and filed and argued the first of three motions to enforce the Patent Rules or strike the contentions. A2551, A6987, A10608. Judge Davis's first Order required UltimatePointer to supplement its contentions with a claim chart for each accused product. A5964-A5965. Because UltimatePointer never acquired or

---

[12] The cited documents are Exhibits 6-13 of the Nelson Declaration, which is located at A17659.

analyzed the majority of accused products, it could not chart them.  So it dropped those 1,700+ products from the case many months later.

Even after dropping the 1,700+ products, UltimatePointer continued to hide the fact that it had never acquired those products.  Over time, however, the disconnect between UltimatePointer's infringement theories and how the accused products operate showed that UltimatePointer and its counsel had not analyzed most of those accused products.  *See generally* A17659 ¶¶ 24-28 and exhibits cited therein. One smoking gun was the fact that sixty of the accused products were never released to market,[13] a fact that took time and effort to establish.  Suspecting that UltimatePointer's failure to investigate extended beyond those sixty products, Nintendo served an interrogatory asking when UltimatePointer acquired (and analyzed) the accused products.  *See* A17669.  UltimatePointer refused to answer voluntarily.  Following two motions to compel (A7257, A11372) and two hearings, UltimatePointer was eventually forced to admit that it acquired only 203 products before the infringement contentions deadline.  A17426 and A17516.

The Washington court failed to award any of the fees Nintendo incurred in seeking the truth about UltimatePointer's improper conduct.  A mere $33,412.75 is manifestly inadequate.  Just exposing UltimatePointer's dereliction required two

---

[13] Similarly, many of the accused games were "Virtual Console" titles, i.e., re-releases of older games from older systems, none of which were compatible with the pointing features of the Wii Remote.  That too took time and effort to determine.

motions to compel and two hearings, which in and of itself cost more than the amount awarded. And the award provided nothing for the investigation, coordination and consulting Nintendo had to do to review their products.

The court's award is also too small to have any deterrent effect. *See Automated*, 202 F.3d at 1355; *Mathis*, 857 F.2d at 754; *see also Raylon LLC v. Complus Data Innovations, Co.*, No. 6:09-cv-335, slip op., at 9 (E.D. Tex. May 4, 2015) (Davis, J.) (discussing importance of deterrence to fees sanctions). If the price for baselessly including thousands of accused products in an infringement claim, then demanding extensive discovery on those products, is only $33,412.75, such conduct is a very cost-effective strategy.

## III. THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO AWARD FEES BASED ON ULTIMATEPOINTER'S PERSISTENT PURSUIT OF CLAIMS FORECLOSED BY CLAIM CONSTRUCTION.

UltimatePointer improperly pursued this infringement case in the district court long after claim construction rendered its allegations meritless on two different bases. First, UltimatePointer knew that the Wii does not perform direct pointing years before UltimatePointer ever filed this lawsuit:

- Dr. Banning is not only the sole inventor of the asserted patents, but is also the CEO and sole owner of UltimatePointer.

- Dr. Banning's knowledge is imputed to UltimatePointer, which is a Delaware corporation. *David. B. Lil Co., Inc. v. Fisher*, 800 F. Supp. 1203, 1207 (D. Del. 1992) (knowledge of director or officer of corporation is imputed to corporation).

- For years leading up to the filing of this case, Dr. Banning told Nintendo, potential investors, and at least one governmental entity that the Wii does not perform direct pointing.

Given this knowledge, UltimatePointer knew that its infringement case was foreclosed when the Eastern District of Texas construed the asserted claims to require direct pointing on May 28, 2013.

Second, UltimatePointer's own expert stated during claim construction, "[i]n the '321 and '729 patent, the 'image' which is sensed is the image of a computer display or computer screen." A3518 at ¶ 4. It was never disputed that the front end of the Wii Remote has a filter that filters out visible light and thus cannot see the computer-generated image on the TV screen. Therefore, based on its own expert's representations, UltimatePointer knew that its infringement case was foreclosed on that basis too.

Although UltimatePointer was obligated to stop litigating its claims in the district court as soon as it knew those claims were meritless, UltimatePointer kept pressing those claims for another year and a half, making this case exceptional. *See MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 920-21 (Fed. Cir. 2012) ("[P]ersist[ing] in advancing unfounded arguments that unnecessarily extended this litigation and caused [Defendants] to incur needless litigation expenses" is "vexatious conduct [that] is, by definition, litigation misconduct" which "supports [a] district court's determination that [a] case is exceptional."); *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1328 (Fed. Cir. 2013) ("[A] party cannot assert baseless

infringement claims and must continually assess the soundness of pending infringement claims, *especially after an adverse claim construction*.").

The district court never reached whether UltimatePointer's claims were meritless following claim construction because the court committed clear legal and factual errors first. The court (1) incorrectly concluded—in conflict with Rule 11—that a plaintiff has no duty to drop meritless claims when victory is "out of reach"; (2) improperly shifted the burden to dismiss meritless claims onto Nintendo; and (3) misunderstood the pre-transfer proceedings in this case in the Eastern District of Texas. In doing so, the court abused its discretion.

### A. The District Court Based Its Decision On Erroneous Understandings Of UltimatePointer's Obligation Not To Pursue A Meritless Claim.

The district court based its decision on an incorrect understanding of UltimatePointer's obligations post-claim construction:

> Defendants offer no case law or other authority that imposes on a litigant an affirmative duty to abandon a claim, thereby waiving all right to appeal, simply because the court issued an interlocutory order that put victory out of reach.

A2-A3.[14] But it is a fundamental principle of patent law and, more generally, litigation, that a party must stop litigating a district court case once "victory [is] out of

[14] The district court also stated that "litigating an infringement action to final judgment despite diminishing odds is not exceptional and does not establish bad faith." A19936. This is incorrect if those "diminishing odds" reach the point that an eventual noninfringement judgment is a foregone conclusion.

reach." This principle underlies § 285, Rule 11 and the precedent of this and every other federal appellate court. *See, e.g.*, Fed. R. Civ. P. 11 (b)(2) (requiring claims be "warranted by existing law or by a nonfrivolous argument for . . . establishing new law"). Contrary to the district court's view, UltimatePointer had the duty to continue to assess the soundness of its infringement claims, "especially after [the] adverse claim construction." *Taurus IP,* 726 F.3d at 1328. Once "victory" was "out of reach," UltimatePointer was obligated to stop pressing towards trial. It failed to do so.

The district court's statement is doubly wrong as it also expresses the erroneous belief that UltimatePointer had no viable options to preserve an appeal. It is well settled that a party preserves its right to appeal by stipulating to a final judgment. *See Taylor Brands, LLC v. GB II Corp.*, 627 F.3d 874, 878 (Fed. Cir. 2010) ("[N]o waiver exists—even without a reservation of appellate rights—when a party consents solely to the form of a judgment, because merely agreeing to the form of a judgment does not in itself imply that the party agrees with the judgment's substantive outcome or intends to abandon its position on the issues."); *see also Nystrom v. TREX Co., Inc.*, 339 F.3d 1347, 1350-51 (Fed. Cir. 2003) (recognizing "three possible avenues" by which parties can seek appellate review following claim construction).

Here, UltimatePointer could have stipulated to noninfringement under the court's claim construction, which would not only have preserved its right to appeal the claim construction but expedited that process. In no circumstances, however, may a plaintiff waste the resources of the court and the defendants by continuing to

pursue claims that it knows have been rendered hopeless by claim construction. *See, e.g., Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1330 (Fed. Cir. 2003) ("pertinent inquiry" in assessing "bad-faith litigation" for § 285 "is whether [the patentee] knew or should have known" that it had no basis for asserting infringement, "but pursued its infringement [allegations] anyway"). UltimatePointer nevertheless forged ahead. That conduct supports an award of fees. *MarcTec,* 664 F.3d at 920-21.

### B. The District Court Improperly Shifted The Duty To Dismiss Meritless Claims From The Plaintiff To The Defendant And Based Its Decision On Erroneous Understandings Of The Pre-Transfer Proceedings In The Eastern District Of Texas.

Rather than deciding whether the claim construction ruling rendered UltimatePointer's infringement claims meritless, the district court assumed that it must not have simply because Nintendo did not immediately move for summary judgment:

> Nor have defendants shown that the court's construction of "direct pointing" and "image sensor" was clearly dispositive at the time. If that were the case, one would expect defendants to promptly move for summary judgment. They did not.

A3. That was the entirety of the district court's analysis on this issue and wrongly inverted the obligations established by Rule 11 and 35 U.S.C. § 285, requiring the defendant to move for summary judgment rather than requiring the plaintiff to continue to assess the merits of its own case.

The court erroneously suggested that Nintendo, not UltimatePointer, was responsible for prolonging this case by pursuing ancillary issues instead of seeking immediate summary judgment:

> [Nintendo instead raised] various challenges to plaintiff's infringement contentions, seeking construction of additional terms, battling over venue, and pursuing discovery for another year or so. The summary judgment motion that ultimately resolved plaintiff's infringement claims was not filed until September 4, 2014, three months after the litigation was transferred to the Western District of Washington.

*Id.* These statements demonstrate a misunderstanding of the proceedings in Texas as well as the rules of practice in that court.

**1. Nintendo Did Seek—And Obtain—Summary Judgment Within The Rules Of The Eastern District Of Texas.**

The district court overlooked that, despite procedural obstacles to doing so, Defendants filed, and *won*, two early summary judgment motions in the Eastern District of Texas.

First, Defendants obtained summary judgment of invalidity for five asserted claims during the *Markman* proceedings. A5956-A5957. That summary judgment was not ancillary, but was brought per the Eastern District of Texas's local rules.

Second, Nintendo sought summary judgment within the parameters set by the Eastern District of Texas. The case schedule prevented Nintendo from filing earlier summary judgment motions, and required Nintendo to seek permission to file any such motion. Nintendo sought permission for early motions and sought full summary

judgment at the earliest time allowed by the case schedule. It did so following the procedures set forth by the local rules. Defendants timely filed five letter briefs before Judge Davis on March 14, 2014, seeking leave to file motions for summary judgment on multiple issues including noninfringement. A11980, A12009, A12021, A12028, A12034. Those letter briefs were never ruled upon, and Nintendo was therefore never permitted to file the corresponding motions for summary judgment in Texas.

Although Judge Davis's default rules forbade filing any additional summary judgment motions until after the close of expert discovery—and even then, only after Judge Davis granted leave on an issue-by-issue basis—Defendants urged Judge Davis to allow them to file an early summary judgment motion on a narrow issue. A5895. Judge Davis agreed, allowing Defendants to seek summary judgment of non-infringement of claim 47 of the '321 patent. A6027-A6028. Accordingly, Defendants promptly filed an early motion for summary judgment on July 15, 2013. A6099. Judge Davis granted that motion on November 7, 2013. A10427. That claim was particularly apt for summary judgment because it alone accounted for more than 90% of the accused products.

Finally, when the Washington district court announced at the first conference following transfer from Texas that it understood the case to be "ready for trial," the parties had to explain that summary judgment issues had already been identified using Judge Davis's letter-brief requirement and needed to be briefed under the Western

District of Washington's briefing rules. This allowed the issues to be decided before trial. A19955:22-A19958:24. Thus, an unnecessary trial was avoided when Nintendo yet again asked for leave to file a summary judgment motion.

In sum, Nintendo took full advantage of the summary judgment procedures at every opportunity. Nintendo recognized that UltimatePointer's claims were rendered meritless by the claim construction, and pursued its arguments based on the established summary judgment procedures of the Eastern District of Texas. That did not relieve UltimatePointer of its own obligations under Rule 11 and § 285, nor did Nintendo's actions endow UltimatePointer's claims with merit. To premise the denial of attorney's fees on the notion that Nintendo somehow failed to move for summary judgment soon enough places the burden on the wrong party, and is inconsistent with the requirements of practice in the Eastern District of Texas.

#### 2. Nintendo's Other Challenges To UltimatePointer's Case Did Not "Delay" The Case, But Were Instead Necessitated By UltimatePointer's Improper Conduct.

The Washington court not only overlooked the early summary judgment motions that Nintendo filed and won and the motions Nintendo sought leave to file, but erroneously contended that Nintendo spent time litigating ancillary issues "instead" of seeking summary judgment. *See* A4 (identifying four issues Nintendo pursued allegedly "instead" of seeking summary judgment). This was mistaken. Each of the actions the court cites was critical for Nintendo to undertake and driven by UltimatePointer's misconduct:

- *"raising various challenges to plaintiff's infringement contentions"*:  As explained in Section II.C. above, Nintendo was forced to file three motions about deficiencies in UltimatePointer's Infringement Contentions in an attempt to understand UltimatePointer's infringement theory.  Judge Davis granted in part all three motions and twice stated, "The Court will consider UltimatePointer's inability to articulate coherent infringement contentions even after several amendments when it evaluates Defendants' claim that this is an exceptional case under 35 U.S.C. § 285."  A12686; A12688.

- *"seeking construction of additional terms"*:  Judge Davis performed supplemental claim construction for the term "spatial state" *in order* to rule on Defendants' early motion for summary judgment of non-infringement of claim 47.  *See* A10403.  The district court's finding that Nintendo pursued this construction "*instead*" of seeking summary judgment is incorrect.

- *"battling over venue"*:  Nintendo filed its original motion to sever, stay, and transfer on January 20, 2012—the same day Nintendo answered UltimatePointer's second amended complaints and *months* before a scheduling order was in place.  But for UltimatePointer's strategic maneuvers, the case could have been promptly transferred.  The Eastern District of Texas almost never entertains summary judgment motions that early in a case, making the district court's identification of this as something Nintendo pursued "instead" of seeking summary judgment error.

- *"pursuing discovery for another year or so"*:  Nintendo could not unilaterally refuse to participate in fact discovery.  And with Judge Davis's rule allowing dispositive motions only after the close of expert discovery, Nintendo could not put the cart before the horse.  Nintendo was also forced to file two motions to compel and argue two hearings before UltimatePointer admitted that it had failed to acquire or analyze 1,700 accused products.  Thus, Nintendo's discovery efforts were subverted by UltimatePointer's misconduct.

The court's reliance on these actions as a basis to deny attorney's fees was an abuse of discretion.

### C. UltimatePointer Improperly Maintained This Litigation Long After Judge Davis's Claim Construction Foreclosed The Outcome.

The district court should have properly reached the question whether UltimatePointer's claims were meritless following claim construction and found this case exceptional on that basis. UltimatePointer has long known that the Wii does not include certain features. When the district court construed the asserted claims to require those features, UltimatePointer therefore knew that its case was meritless. UltimatePointer nonetheless continued to pursue its claims for 19 additional months. UltimatePointer's failure to acknowledge that its case was doomed caused Nintendo to expend millions of dollars in additional defense costs.

#### 1. UltimatePointer Has Known For Years That The Wii Remote Is Not A "Direct Pointing Device."

Dr. Banning's knowledge is imputed to UltimatePointer, which is a Delaware corporation. *David. B. Lil Co.,* 800 F. Supp. at 1207 (D. Del. 1992); *see also Refco Group Ltd., LLC, v. Cantor Fitzgerald, LP*, No. 13 Civ. 1654, 2014 WL 2610608, at * 23 (S.D.N.Y. June 10, 2014) ("As a general rule, Lutnick's knowledge can be imputed to the entities in which he was a director or officer.").

Before he ever filed this lawsuit, Dr. Banning—and thus UltimatePointer—knew that the Wii does not perform direct pointing. Dr. Banning defined "direct pointing devices" in his patents to mean "those for which the physical point-of-aim coincides with the item being pointed at, i.e., it lies on the line-of-sight." A320, 1:60-63. As Dr. Banning knew, the Wii does not do this, but instead relies on the

interaction of the Wii Remote and the Sensor Bar to position the cursor on the TV screen. *See* Nintendo's Resp. Br., 46-48. Dr. Banning stated many times that the Wii does not perform direct pointing as defined in his patents. For example, in a communication with potential investors only one year before filing this lawsuit, Dr. Banning asserted that the Nintendo Wii cannot cause the cursor on the screen to follow the handheld remote's physical point-of-aim:

> [S]ystems like the Nintendo Wii . . . offer in-air operation, but none of these is capable of having the cursor on the screen follow the physical point-of aim of a handheld remote.

A13823. Dr. Banning made this statement after he had physically obtained a Wii system and carefully studied it. In a different communication, this time applying to a Scottish government entity for a £70,000 grant, Dr. Banning explained that:

> [T]he Wii is approximate in its pointing. With big screens it's not really accurate.

A13699. In that same grant application, he suggested that Nintendo deliberately avoided using his patents' technology:

> Nintendo looked at my patents in 2005, and eventually said [they] weren't going to use them. Then later on I find their patents do in fact speak about calibrating, even though the Wii as available now doesn't use the calibration. So I think they looked at it, but probably found that if they used the calibration they might be interfering with me.

A13699. In short, Dr. Banning and UltimatePointer fully understood that the Wii did not perform, nor even attempt to perform, direct pointing.

Because UltimatePointer already knew that the Wii did not perform direct pointing, UltimatePointer needed the district court to construe the asserted claims in way that would not require direct pointing. But Judge Davis did the opposite: he construed "handheld device" to mean "handheld direct pointing device." A5925. UltimatePointer could no longer argue in good faith that the Wii infringes those claims. As this Court has explained, a party "must continually assess the soundness of pending infringement claims, especially after an adverse claim construction." *Taurus IP, LLC*, 726 F.3d at 1328.

**2. UltimatePointer Could Not Reasonably Contend That The Wii Has An "Image Sensor," As Construed By Judge Davis.**

All five asserted claims of the '729 patent require an "image sensor," which the Court construed to be "a device that measures the intensity of reflected light from an image." A5947. The claims themselves make clear that the required image is one displayed on the computer screen when they introduce the image requirement as a "computer generated image." A336. Likewise, UltimatePointer's own expert, Dr. Hooper, stated, "[i]n the '321 and '729 patent, the 'image' which is sensed is the image of a computer display or computer screen." A3518 at ¶ 4. Accordingly, to infringe, the Wii would have to sense the image on the display screen. UltimatePointer never disputed, however, that the front end of the Wii Remote filters out visible light and

thus cannot see the computer-generated image on the display screen.[15]  That fact was dispositive.

UltimatePointer knew that the Wii does not do what common sense and its own expert say the patent requires, yet UltimatePointer took the position that the Wii system nevertheless satisfies this limitation because the sensor located at the end of the Wii Remote senses light from the infrared LEDs on the Sensor Bar.  That position is inconsistent with claim terms and with its own expert's statement.  Further, for UltimatePointer to be correct, the word "image" would need to have different meanings in different portions of the same claim, alternating between references to the image on the screen and the "image" of LED lights.  Such a construction is contrary to common sense and this Court's precedent.  *See*, *e.g.*, *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent").

As explained more fully in Nintendo's brief in the companion appeal on the merits, UltimatePointer's argument was irreconcilable with the known and undisputed facts of this case.   *See* Confidential Resp. Br., Case No. 2015-1297, at 24-30.

---

[15] To avoid Dr. Hooper's admission, UltimatePointer contrived a theory wherein the "image" that is sensed is different that the image referred to in the claim. The Court rightly rejected that theory on summary judgment.  A17170.

## IV.    THE DISTRICT COURT DID NOT ADDRESS NINTENDO'S REQUEST THAT ULTIMATEPOINTER AND ITS COUNSEL BE JOINTLY AND SEVERALLY LIABLE FOR FEES AWARDED.

Perhaps because it largely denied Nintendo's request for attorney's fees, the district court never addressed whether UltimatePointer and its counsel, Conley Rose, P.C., should be jointly and severally liable for the fees awarded.

Joint and several liability is available under the court's inherent power. *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766 (1980) ("If a court may tax counsel fees against a party who has litigated in bad faith, it certainly may assess those expenses against counsel who willfully abuse judicial processes."). It is available under 28 U.S.C. § 1927 and Federal Rule of Civil Procedure 11, the latter of which was contravened when UltimatePointer's counsel failed to acquire or analyze 1,700+ products. *See View Eng'g*, 208 F.3d 981, 986 (Fed. Cir. 2000) ("Before filing [claims] of patent infringement, Rule 11, we think, must be interpreted to require *the law firm* to, at a bare minimum, apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted.").

The litigation tactics at issue in this case—such as manipulating venue laws, failing to adequately evaluate accused products before filing suit, failing to provide proper infringement contentions, and failing to assess the merits of the infringement allegations following claim construction—were largely lawyer-driven. That makes joint and several liability proper. Joint liability should also be imposed here because

UltimatePointer has no assets other than the patents-in-suit and related applications. As of the date of this filing, UltimatePointer has not posted the bond required for its appeal of the fees and costs awards.  In contrast, UltimatePointer's litigation counsel, Conley Rose, is a multi-office law firm that has already agreed to pay other costs. A18877.  Accordingly, Nintendo respectfully requests that this Court direct the district court to decide whether to award fees on a joint and several basis.

## CONCLUSION

For the foregoing reasons, the district court's finding that the case was "exceptional" should be affirmed, but the amount of the award should be vacate and the case remanded for an appropriate award of greater fees and a determination of whether UltimatePointer's counsel should be jointly and severally liable for the award.

Dated:  June 22, 2015

Respectfully submitted,

/s/ Mark C. Nelson

MARK C. NELSON
STEVEN M. GEISZLER
RICHARD D. SALGADO
DENTONS US LLP
2000 McKinney Ave., Ste. 1900
Dallas, Texas 75201
(214) 259-0935

JERRY A. RIEDINGER
TYLER C. PETERSON
PERKINS COIE LLP
1201 Third Ave.
Ste. 4900
Seattle, WA 98101
(206) 359-8000

*Attorneys for Appellees Nintendo Co., Ltd. and Nintendo of America Inc.*

# ADDENDUM

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ULTIMATEPOINTER, LLC,

Plaintiff,

v.

NINTENDO CO., LTD., and NINTENDO OF AMERICA, INC.,

Defendants.

Case No. C14-0865RSL

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR ATTORNEY'S FEES

This matter comes before the Court on "Defendant Nintendo's Motion for Fees." Dkt. # 606.[1] Nintendo seeks an award of $7,406,362.99 under the inherent powers of the Court and/or the statutory authorization provided in 35 U.S.C. § 285.[2] Having reviewed the memoranda, declarations, and exhibits submitted by the parties,[3] the Court finds as follows:

Despite the "American Rule" against fee-shifting, courts retain the inherent power to award fees to the prevailing party upon a showing of "willful disobedience of a court order" or actions taken "in bad faith, vexatiously, wantonly, or for oppressive reasons." Alyeska Pipeline Serv. Co. v. Wilderness Society, 421 U.S. 240, 258-59 (1975). In addition, 35 U.S.C.

[1] An unredacted sealed version of the motion is found at Dkt. # 607.

[2] The Court has not considered defendants' one-sentence request for sanctions under 28 U.S.C. § 1927. Dkt. # 606 at 4 n.4.

[3] This matter can be decided on the papers submitted. Defendants' request for oral argument is DENIED.

§ 285 states that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The Supreme Court defines an "exceptional case" as "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Octane Fitness, LLC v. ICON Health & Fitness, Inc., __ U.S. __, 134 S. Ct. 1749, 1756 (2014). The statute is inherently flexible, and district courts are to evaluate the totality of the circumstances and exercise their equitable discretion after considering factors such as frivolousness, motivation, objective unreasonableness, and/or the need to compensate or deter parties. Id. (citing Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 (1994)). Although it rejected the more rigid analysis applied by the Federal Circuit, the Supreme Court reiterated that the type of equitable circumstances that would warrant a fee award under § 285 would remain relatively "rare." Octane Fitness, 134 S. Ct. 1753, 1756-57.

Defendants argue that fees are appropriate under both the inherent powers and § 285 because plaintiff (a) improperly joined parties and claims in an effort to manipulate venue, (b) failed to adequately analyze most of the accused products and provided opaque infringement contentions, and (c) pursued the action in bad faith following construction of certain claim terms on May 28, 2013. Defendants have not shown that plaintiff's choices regarding venue or its failure to voluntarily dismiss this action after May 28, 2013, violated a court order, were in bad faith, or are otherwise "exceptional." Venue was proper in Texas, and plaintiff's claims against the various defendants were not meritless. The fact that plaintiff voluntarily dismissed many of the defendants after discovering that their market share and/or sales did not justify further litigation does not necessarily mean that the claims were brought in bad faith or are otherwise sanctionable. With regards to the impact of the May 28, 2013, claim construction, defendants use hindsight to argue that plaintiff should have realized that it would be unable to prove infringement and immediately dismissed the case. Defendants offer no case law or other authority that imposes on a litigant an affirmative duty to abandon a claim, thereby waiving all

right to appeal, simply because the court issued an interlocutory order that put victory out of reach. Nor have defendants shown that the court's construction of "direct pointing" and "image sensor" was clearly dispositive at the time. If that were the case, one would expect defendants to promptly move for summary judgment. They did not, instead raising various challenges to plaintiff's infringement contentions, seeking construction of additional terms, battling over venue, and pursuing discovery for another year or so. The summary judgment motion that ultimately resolved plaintiff's infringement claims was not filed until September 4, 2014, three months after the litigation was transferred to the Western District of Washington. Litigating an infringement action to final judgment despite diminishing odds is not exceptional and does not establish bad faith.

The Court is, however, concerned with the adequacy of counsel's pre-litigation analysis of most of the accused products and plaintiff's subsequent inability to articulate infringement contentions regarding those products. Dkt. # 269 at 4-6. Plaintiff served its original infringement contentions on June 8, 2012, identifying 1,912 Wii games. At the time, plaintiff had acquired only 203 of the games, but deemed the other 1,700+ games substantially similar to the games in its possession. Plaintiff was incorrect as a matter of both fact and law. As a factual matter, some of the accused products were significantly different from the acquired games: certain games had never been released to the market and others were used with older game systems that were incompatible with the pointing features of the Wii remote. As a legal matter, the presiding judge determined that the contentions were deficient in that they were not precise and detailed enough to provide defendants with adequate notice of the plaintiff's theories of infringement. Dkt. # 269 at 5. Rather than amend the infringement contentions regarding the products that were not in its possession, plaintiff abandoned those claims on or about June 14, 2013.

In short, plaintiff had no basis for its assumption that all of the accused games were substantially similar and therefore subject to the same infringement analysis. The Court

Case 2:12-cv-00153265-RSL Document 632 Filed 03/11/15 Page 4 of 5

finds that the unnecessary and unsupported addition of over 1,700 accused products with no attempt to substantiate the accusations was in bad faith, vexatious, wanton, and, in the absence of any reasonable justification for the expansion, deemed to be for oppressive reasons. Even in the high-stakes, high-cost context of patent litigation, this gratuitous addition of products was exceptional: it stands out from other cases because of the substantive weakness of plaintiff's litigating position and the unreasonable and unnecessary burdens the expansion imposed on this litigation.[4]

The question, then, is what portion of counsels' fees is attributable to the presence of those 1,700+ products in this action between June 8, 2012, and June 14, 2013. Defendants seek $334,127.50 in fees for all work related to the perceived deficiencies in plaintiff's infringement contentions. Decl. of Mark C. Nelson (Dkt. # 608), Ex. 16. However, that amount includes fees that were generated after plaintiff had abandoned its claims against the 1,700+ products and/or which were related to accused products that plaintiff actually had in its possession. A review of the letters, motions, and billing records between June 8, 2012, and June 14, 2013, shows that very little time was dedicated solely to the 1,700+ products. The deficiencies in the original infringement contentions were universal, and, for the most part, defendants addressed those deficiencies en masse. Certain time entries can be linked to the 1,700+ products, however, such as efforts to identify and review third-party games and an initial analysis regarding a potential summary judgment motion regarding the older games. In addition, time dedicated to certain tasks, such as reviewing the contentions and revising initial disclosures to account for all accused products, was undoubtedly increased by the addition of 1,700+ games. Having reviewed the time entries related to the infringement contentions, the Court finds that 10% of the requested fees ($33,412.75) is properly attributable to plaintiff's unsupported and

[4] With regards to the products that were in plaintiff's possession, defendants have shown only that plaintiff's infringement theories were amended as the patent claims were construed and were ultimately rejected. Neither fact establishes bad faith or an exceptional case.

unnecessary expansion of the litigation.[5]

For all of the foregoing reasons, defendants' motion for attorney's fees is GRANTED in part. Plaintiff shall pay to defendants attorneys fees in the amount of $33,412.75 within fourteen days of the date of this Order.

Dated this 9th day of March, 2015.

Robert S. Lasnik
United States District Judge

[5] Plaintiff's only challenge to the reasonableness of the fees charged in this litigation is based on the fact that the overall amount billed exceeds the median amount charged for this type of litigation according to the 2013 AIPLA Report of the Economic Survey. Dkt. # 634 at 12. Plaintiff does not address the reasonableness of the number of hours spent correcting deficiencies in the infringement contentions or dealing with the explosion of accused products. While there is no doubt that the case was heavily staffed on defendants' side, the Court finds that the hourly rate and the number of hours spent addressing the 1,700+ games that were added to the litigation in June 2012 were reasonable.

**CERTIFICATE OF SERVICE**

I, Mark C. Nelson, hereby certify that on June 22, 2015, I will cause to be served electronically on all counsel of record the foregoing brief.

Gregory Loren Maag
gmaag@conleyrose.com
Charles J. Rogers
(principal counsel)
crogers@conleyrose.com
Thomas L. Warden
twarden@conleyrose.com
Michael J. Guthrie
mguthrie@conleyrose.com
Conley Rose, P.C.
Suite 1800
1001 McKinney Street
Houston, Texas 77002-6421

Attorneys for Appellees
UltimatePointer, L.L.C.

Paper copies will be mailed to the above principal counsel when the paper copies are sent to the Court. Six Paper copies will be sent to the Court within the time specified by the Court's rules.

June 22, 2015
Date

*/s/ Mark C. Nelson*

Mark C. Nelson
DENTONS US LLP
2000 McKinney Ave., Ste. 1900
Dallas, Texas 75201
(214) 259-0900
(214) 259-0910 (fax )
mark.nelson@dentons.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. Proc. 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this brief includes 12,718 words.

2. This brief has been prepared in proportionally spaced typeface using Microsoft Word 2003 in 14 point Garamond font. As permitted by Fed. R. App. Proc. 32(a)(7)(C), the undersigned has relied upon the word count of this word-processing system in preparing this certification.

June 22, 2015
Date

*/s/ Mark C. Nelson*

Mark C. Nelson
DENTONS US LLP
2000 McKinney Ave., Ste. 1900
Dallas, Texas 75201
(214) 259-0900
(214) 259-0910 (fax )
mark.nelson@dentons.com